# UNITED STATES OF AMERICA
# DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Karen Cooper and Linda Dykeman, )<br><br>Plaintiffs )<br>v. )<br>)<br>The YMCA of Greater Providence )<br>and Steven O'Donnell )<br>Defendants ) | Civil Action No. |

## COMPLAINT

### Jurisdiction and Venue

1. Jurisdiction over this matter exists pursuant to 28 U.S.C. §1331 because these plaintiffs seek redress under federal law. To wit, these are claims brought pursuant to 28.U.S.C. 2000(e) and 2000(e)-3, also known as Title VII of the Civil Rights Act of 1964; this Court has pendant jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

2. The proper venue for this civil action is the United States District Court of Rhode Island pursuant to 28 U.S.C. §1391 because all acts and omissions giving rise to the cause of action occurred in or around the City of Providence, Rhode Island.

### Facts

### Parties

3. Linda Dykeman is an individual who resides in Rehoboth, Massachusetts. She was, at all times, relevant to this Charge of Discrimination, an employee of the defendants as

1

defined by Rhode Island General Laws §28-5-7 and 42 U.S.C. §2000(e); also known as Title VII of the Civil Rights Act of 1964.

4. Karen Cooper is an individual who resides in Tiverton, Rhode Island.  She was, at all times, relevant to this Complaint, an employee of the defendants as defined by Rhode Island General Laws §28-5-7 and 42 U.S.C. §2000(e); also known as Title VII of the Civil Rights Act of 1964.

5. Steven O'Donnell is an individual whose home address will not be revealed in this public document because he is a former law enforcement officer.  He was, at all relevant times to this Complaint, the CEO of the YMCA of Greater Providence and, in that capacity, had managerial and supervisory authority over the Complainants as by Rhode Island General Laws §28-5-7 and 42 U.S.C. §2000(e); also known as Title VII of the Civil Rights Act of 1964.

6. YMCA of Greater Providence is a local non-profit 501(c)(3) corporation duly formed under the laws of the state of Rhode Island with principal place of business located at 371 Pine Street in Providence, Rhode Island.  This corporation was, at all times relevant to this Charge, the Complainants' employer.

7. Ms. Dykeman is a Certified Public Accountant, educated at the University of Rhode Island and Johnson & Wales University.  She has a long work history in accounting dating back to 1987 and, since 2001, has had a number of long-term positions in the public and private sector in which she worked as the Staff Accountant, Controller, Treasurer, and/or business manager for massive organizations with budgets ranging from seventeen to forty-two million dollars annually and with hundreds of employees.

8. Ms. Dykeman left a long-term, lucrative position with her former employer to work for the Y-Providence after being solicited for the position.

9. Plaintiff Karen Cooper was employed by the Y-Providence as the Chief Development & Marketing Officer from December, 2016 until February 17, 2017. Ms. Cooper has over twenty five years of professional experience in which she has led philanthropy operations at local, regional and international nonprofits with budgets exceeding $25 million. Ms. Cooper has served on many boards for nonprofits and professional associations including the National Board for Philanthropic Planning. She has received numerous accolades for her professional accomplishments including the Outstanding Fundraising Professional by the Association of Fundraising Professionals of RI, the Alumni Achievement Award from Salve Regina University and best foundation and program awards from the International Catholic Stewardship Council. She is a sought after speaker and has presented on numerous topics relative to fundraising and philanthropy to vast audiences over her career.

10. Ms. Cooper left a long-term, lucrative position in the private-sector to work for the Y-Providence after being offered a position.

11. Respondent Steven O'Donnell was hired as the CEO of the Y-Providence in October, 2016.

12. Upon information and belief, Mr. O'Donnell would often brag about his history of, and ability to, retaliate against his professional rivals. Upon information and belief, he would recount stories about how he "knocked out" his professional rivals and would retaliate against various individuals whom he believed had slighted him, and boasted

about his history of doing so in the past in order to secure, and retain, highly coveted professional positions of influence and power in the community.

13. The GPYMCA distributes a handbook to employees which provides in pertinent part, "if an employee wishes to discuss harassment involving a member of senior management, the employee may contact the Chairman of the Board of Directors."

14. Within a few weeks of being hired Mr. O'Donnell was engaged in an increasingly hostile relationship with two female executive-level employees, Ms. Cooper and Ms. Dykeman.

15. During early 2017, Mr. O'Donnell's behavior towards Ms. Cooper and Ms. Dykeman continued to escalate until they finally made formal verbal complaints to the Vice President of Human Resources and the Chairman of the Board of Directors (the Chair).

16. Those complaints, in summary, claimed, by way example and not limitation, that:

    a. Mr. O'Donnell treated the Complainants differently, more harshly, and with less respect than the male executives;

    b. Mr. O'Donnell would micro-manage the Complainant's performance, despite his lack of qualifications to perform or understand the essential functions of their jobs;

    c. Mr. O'Donnell would chastise, scold, belittle, and demean the females but did not speak to the males in that way;

    d. Mr. O'Donnell would demand an immediate response to his text or emails from the females; throwing temper tantrums when they took too long to reply to him – he did not treat the males the same way;

e. He would interfere with the essential functions of their positions to such an extent that they could not perform even minor tasks without his input and tacit approval-the males were not subject to that level of control or oversight;

f. He would send the females aggressive, threatening, and demeaning emails and text messages at all hours of the night and on weekends-the males were not treated the same way;

g. He stripped the females of many of their executive authorities and duties – for example, preventing them from hiring support staff, forbidding them from conducting meetings or engaging in meaningful discussion with other executives, preventing them from conducting team meetings with their peers without his permission and presence at the meeting; preventing them from speaking with vendors, potential donors, and even board members;

h. He would schedule meetings with them and cancel those meetings or simply not show-up; he would reprimand them for nonsensical issues; he prohibited and forbid them from attending meetings that were essential, necessary, and material for them to do their jobs;

i. He would refuse to attend critical meetings and events in which CEO's are expected to work in cooperation with the executive teams and, in so-doing, undermined the authority and credibility of the female executives.

j. On one occasion, Ms. Dykeman approached Mr. O'Donnell to complain that he had failed to attend a financial committee meeting and that his absence left her in a difficult situation.  Mr. O'Donnell responded by demanding, in an aggressive

and demeaning tone, that Ms. Dykeman provide him with an article of her personal clothing so that he could "shine his shoes" with it;

k. O'Donnell's harassment became so severe, pervasive, and constant that the women were facing conflict and experiencing shame, humiliation, anxiety, and fear on a daily basis because of it.

17. When making their complaint to HR they provided specific examples of the harassment and cited the disparate treatment of the executive-level male employees as corroborating evidence.

18. In response to the complaints of harassment lodged by Ms. Cooper and Ms. Dykeman, independent counsel was engaged to advise the executive board how to handle and investigate the allegations of harassment by Mr. O'Donnell.

19. Ms. Cooper and Ms. Dykeman filed a written complaint with Human Resources on January 19, 2017 in which they requested that an investigation be conducted into Mr. O'Donnell's harassment.

20. Mr. O'Donnell immediately attempted to suspend the employment of the Complainants, claiming that their complaints "were not made in good faith."

21. After meeting with counsel, the Executive Board did not permit the suspensions to occur and gave Mr. O'Donnel an express, written warning not to take any further action in order to retaliate against the plaintiffs or any other individuals relative to the complaint(s) of discrimination.

22. Notwithstanding the warning not to retaliate, Mr. O'Donnell scheduled and held a confidential meeting of the Board of Directors which resulted in the Board voting to remove the Chair, the only person who could under the terms of the Handbook, take reports of harassment involving the CEO.  Upon information and belief, the Respondent made false, malicious, and defamatory statements about the Chair in order to persuade thirty-two Board members to terminate her as the Chair.

23. The vice-chair of the Executive Committee abstained from the vote.  Upon information and belief, she was removed and/or resigned from that position one week after the vote.

24.  Upon information and belief, the effort to remove the Chair from her position was in retaliation for her efforts to intervene on behalf of the plaintiffs and in order to interfere with the investigation into their complaints.

25.  On January 24, 2017, an independent investigator was hired by counsel for the GPYMCA to investigate the claims of the two employees.

26. Shortly thereafter, the Board and the newly-installed Chair, Jamia McDonald (the "new Chair") terminated the independent investigation even though they knew that it was incomplete.  Specifically, the investigator was prohibited from interviewing witnesses that were identified by the Complainants as individuals who would have information corroborating the complaints of discrimination and harassment.

27. The Complainants, through counsel, contacted the new Chair directly and requested that the investigation be re-opened and completed in a competent, thorough, and fair manner.  That request was ignored.

28. The investigator released an investigative report in which she specifically noted that her investigation was prematurely terminated by the Board, preventing her from interviewing a number of witnesses.

29. Specifically, the investigation was terminated less than twenty-four hours before the Investigator was scheduled to interview the former Chair and it appears as if the investigation was terminated specifically in order to prevent the investigator from interviewing the former Chair.

30. Despite the Board's interference, the investigator concluded, in pertinent part, that:
    a. Certain female employees that she interviewed seemed guarded, fearful, and eager to provide testimony helpful to O'Donnell while being non-responsive to questions that would tend to support the claims of harassment and discrimination;
    b. That at least one male executive corroborated the allegation that the female executives are held to harsher standards of performance, held to harsher standards of conduct, and are treated more harshly and with less respect than the males.

31. The investigator supported the allegation that the Complainants were subjected to an intimidating environment caused by Mr. O'Donnell and that Mr. O'Donnell had violated YMCA policies, procedures, and core principals; but concluded there was not sufficient information to conclude that the intimidating environment was because of their gender.

32. The Complainants, again, contacted the new Chair directly and requested that a complete investigation that included interviews of all witnesses be conducted so that

8

the results would not be tainted by the premature termination of the investigation. That request was ignored.

33. Upon information and belief, in response to the report, Mr. O'Donnell immediately issued a so-called "CEO Report" in which he revealed that he had conducted his own investigation of the Complainants' claims, without the knowledge or approval of the Board. In that report he concluded:

   a. That unlike the independent investigator, he found there to be ample evidence that the complaints made by Ms. Cooper and Ms. Dykeman were made in bad-faith;

   b. That unlike the independent investigator, he found no evidence corroborating the claims of an intimidating environment caused by him;

   c. That, unlike the independent investigator, he found no evidence that any YMCA policies or core principles had been violated by him;

   d. That the plaintiffs, in lodging their complaints of discrimination, knowingly made false statements against him.

34. Based on his independent investigation, the CEO made the following recommendations to the Board:

   a. That the male employees who corroborated the allegations against him be suspended from work without pay because of their testimony;

   b. That a female employee, whom the independent investigator described as "making a concerted effort to be supportive of [O'Donnell] as opposed to reporting her observations," be rewarded with a substantial pay raise;

9

c. That corrective action be taken to punish Ms. Cooper and Ms. Dykeman for their "bad faith" allegations against him.

35. The Board dismissed the complaints made by Ms. Cooper and Ms. Dykeman as "without merit." This conclusion was reached despite written acknowledgement from the investigator that the investigation uncovered an intimidating and hostile environment, despite the investigator's acknowledgement that the investigation was incomplete, and despite the Complainants' request that the investigation be completed.

36. O'Donnell then immediately informed the Complainants that it was very difficult to be accused of harassment but that he would "try" to move past it. He went on to tell them that if they did not return to work he would "presume" that they abandoned their jobs.

37. Upon information and belief, the Board has not disciplined, reprimanded, or taken any other remedial action against the CEO whatsoever.

38. Thus, with no remedial action taken regarding the substantiated claims of a hostile and intimidation environment, plus the Board's ratification of that environment, plus the Board's unequivocal and intentional efforts to thwart the investigation of that environment, the Complainants were constructively and unlawfully terminated from their employment because they cannot, and no reasonable person should be required to, endure an intimidating and hostile environment because of their gender.

Claims

Claims by Linda Dykeman Against the YMCA

Count I - Discrimination In Violation of Rhode Island General Laws §28-5-6

39. Ms. Dykeman restates all previous paragraphs by reference as if stated fully herein.

40. The YMCA of Greater Providence did violate R.I. Gen. Laws §28-5-6 (the Fair Employment Practices Act – "FEPA") by the facts described herein, by discriminating against her with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her gender.

41. As a result, she has suffered and continues to suffer damages.

<u>Count II - Retaliation In Violation of Rhode Island General Laws §28-5-6(5)</u>

42. Ms. Dykeman restates all previous paragraphs by reference as if stated fully herein.

43. The YMCA of Greater Providence did violate R.I. Gen. Laws §28-5-6(5) (the Fair Employment Practices Act) by the facts described herein, by discriminating against her because she opposed a practice forbidden by FEPA and/or because he or she has made a charge, testified, or assisted in any manner in any investigation, proceeding, or hearing under the FEPA.

44. As a result, she has suffered and continues to suffer damages.

<u>Count III - Discrimination in Violation of 42 U.S.C. §2000e ("Title VII" of the Civil Rights Act of 1964)</u>

45. Ms. Dykeman restates all previous paragraphs by reference as if stated fully herein.

46. The YMCA of Greater Providence did violate Title VII by the facts described herein, by discriminating against her with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her gender.

47. As a result, she has suffered and continues to suffer damages.

<u>Count IV - Retaliation in Violation of 42 U.S.C. §2000e-3 ("Title VII" of the Civil Rights Act of 1964)</u>

11

48. Ms. Dykeman restates all previous paragraphs by reference as if stated fully herein.

49. The YMCA of Greater Providence did violate Title VII by the facts described herein, by discriminating against her because she opposed a practice forbidden by FEPA and/or because he or she has made a charge, testified, or assisted in any manner in any investigation, proceeding, or hearing under the law.

50. As a result, she has suffered and continues to suffer damages.

<u>Claims by Linda Dykeman Against Steven O'Donnell</u>

<u>Count V - Defamation</u>

51. Ms. Dykeman restates all previous paragraphs by reference as if stated fully herein.

52. Mr. O'Donnell did publish statements about Ms. Dykeman that he knew and/or should have known were false, with actual malice, and the intent to cause harm to Ms. Dykeman and/or to her reputation.

53. As a result, Ms. Dykeman did suffer harm and/or harm to her reputation and she continues to suffer damages to this day.

<u>Claims by Karen Cooper Against the YMCA</u>

<u>Count VI - Discrimination In Violation of Rhode Island General Laws §28-5-6</u>

54. Ms. Cooper restates all previous paragraphs by reference as if stated fully herein.

55. The YMCA of Greater Providence did violate R.I. Gen. Laws §28-5-6 (the Fair Employment Practices Act – "FEPA") by the facts described herein, by discriminating

against her with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her gender.

56. As a result, she has suffered and continues to suffer damages.

### Count VII - Retaliation In Violation of Rhode Island General Laws §28-5-6(5)

57. Ms. Cooper restates all previous paragraphs by reference as if stated fully herein.

58. The YMCA of Greater Providence did violate R.I. Gen. Laws §28-5-6(5) (the Fair Employment Practices Act) by the facts described herein, by discriminating against her because she opposed a practice forbidden by FEPA and/or because he or she has made a charge, testified, or assisted in any manner in any investigation, proceeding, or hearing under the FEPA.

59. As a result, she has suffered and continues to suffer damages.

### Count VIII - Discrimination in Violation of 42 U.S.C. §2000e ("Title VII" of the Civil Rights Act of 1964)

60. Ms. Cooper restates all previous paragraphs by reference as if stated fully herein.

61. The YMCA of Greater Providence did violate Title VII by the facts described herein, by discriminating against her with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her gender.

62. As a result, she has suffered and continues to suffer damages.

### Count IX - Retaliation in Violation of 42 U.S.C. §2000e-3 ("Title VII" of the Civil Rights Act of 1964)

63. Ms. Cooper restates all previous paragraphs by reference as if stated fully herein.

64. The YMCA of Greater Providence did violate Title VII by the facts described herein, by discriminating against her because she opposed a practice forbidden by FEPA and/or because he or she has made a charge, testified, or assisted in any manner in any investigation, proceeding, or hearing under the law.

65. As a result, she has suffered and continues to suffer damages.

<u>Claims by Karen Cooper Against Steven O'Donnell</u>

<u>Count X - Defamation</u>

66. Ms. Cooper restates all previous paragraphs by reference as if stated fully herein.

67. Mr. O'Donnell did publish statements about Ms. Dykeman that he knew and/or should have known were false, with actual malice, and the intent to cause harm to Ms. Cooper and/or to her reputation.

As a result, Ms. Cooper did suffer harm and/or harm to her reputation and she continues to suffer damages to this day.

<u>Prayer for Relief and Demand For Trial By Jury</u>

Wherefore, your plaintiffs pray that this honorable Court:

a. Enter judgment in their favor on all counts against the defendants;

b. Award them with actual damages, damages for emotional distress, and punitive damages;

c. Award any other relief whether or not equitable in nature that this Court deems fair and just;

d. ***The plaintiffs further request and demand a trial by jury for all claims so triable***.

Respectfully submitted by counsel,

**/s/ Kevin P. Braga**
Kevin Braga (local counsel)
RI Bar # 8285
The Law Office of Kevin P. Braga
2095 Elmwood Avenue, Suite B
Warwick, RI 02888
kevin@kpbragalaw.com