UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

Karen Cooper and Linda Dykeman

     v.                          Civil No. 17-cv-601-JNL-AKJ

The Greater Providence Young
Men's Christian Association and
Steven G. O'Donnell

**MEMORANDUM ORDER**

Plaintiffs Karen Cooper and Linda Dykeman allege that the Greater Providence Young Men's Christian Association and their former supervisor, Steven O'Donnell, subjected them to a hostile work environment based on their gender and retaliated against them when they complained of this discrimination, in violation of federal and state law. The defendants move for summary judgment on all claims. This court has subject-matter jurisdiction over the case under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction).

There are genuine, material disputes in the record about whether the plaintiffs faced harassment based on their gender, whether the plaintiffs faced harassment so severe or pervasive that it altered the conditions of their employment, whether the plaintiffs suffered retaliatory adverse action after they complained of discrimination, and whether the plaintiffs were constructively discharged. The defendants' motion for summary

judgment is thus denied, except as to defamation claims which the plaintiffs no longer press.

## I.   **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in the non-moving party's favor at trial, and "material" if it could affect the outcome of the suit under applicable law.  See Cherkaoui v City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017).  In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving" parties.  Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  But the court "will disregard conclusory allegations, improbable inferences, and unsupported speculation." Cherkaoui, 877 F.3d at 24.  It is thus "well-settled that a judge must not engage in making credibility determinations or weighing the evidence at the summary judgment stage," but "it is equally clear that judges cannot allow conjecture to substitute for the evidence necessary to survive summary judgment." Town of Westport v. Monsanto Co., 877 F.3d 58, 66 (1st Cir. 2017).

## II.  **Background**

The relevant facts, viewed in the light most favorable to the plaintiffs as required by Rule 56, are as follows:

### A.  **Dykeman, O'Donnell, and Cooper begin work at the GPYMCA**

The GPYMCA hired Dykeman as Chief Financial Officer in March 2016.  Gayle Corrigan, at the time a member of the GPYMCA board, recruited Dykeman for the position.  Corrigan had recruited Dykeman for another position with a different organization several years earlier, and the two were members of the same social club.  A few months later, Corrigan became the chair of the GPYMCA board.  As CFO, Dykeman was a member of the GPYMCA's Senior Leadership Team ("SLT"), which also included Chief Operating Officer Carl Brown and Vice President of Human Resources Rann Hannagan.

On October 31, 2016, the GPYMCA hired Steven O'Donnell as Chief Executive Officer.  At that time, the GPYMCA was in significant financial distress.  The selection process included interviews with the members of the SLT.  The SLT did not rank O'Donnell as the top candidate after an initial interview, but was asked to reevaluate him by the GPYMCA's search group.  The second interview was more favorable.  After O'Donnell became CEO, the GPYMCA's board grew from 13 members to 34 members, at least in part through recruitment efforts by O'Donnell.

Cooper began working as the Chief Marketing and Development Officer for the GPYMCA on December 5, 2016. Her hiring process included interviews with the members of the SLT and Corrigan. Unlike Dykeman, Cooper first met Board Chair Corrigan in this interview process. The SLT ranked Cooper as the top candidate for the position. CEO O'Donnell agreed that Cooper should be hired. Human Resources VP Hannagan extended an offer to Cooper. O'Donnell later admonished Hannagan for doing so, advising that it was his place, not Hannagan's, to hire for leadership positions. O'Donnell announced Cooper's hiring internally with an email describing her as a "standout" candidate and "fantastic fit" for the organization's needs. The defendants argue that these statements mean O'Donnell could not have harbored any discriminatory animus toward Cooper, but at summary judgment the court cannot draw that inference, and must instead draw all inferences in favor of the plaintiffs.

Cooper joined the SLT. All of the SLT members reported directly to CEO O'Donnell. Cooper and Dykeman worked with other female employees beyond the SLT, including Tempie Thompson, Neta Taylor, Christine Spagnoli, and Cathy Azzoli, O'Donnell's executive assistant. Internal sources evaluated both Cooper's and Dykeman's job performance positively.

At the time O'Donnell became CEO, the SLT held regular weekly meetings. Dykeman viewed SLT meetings as necessary for

the functioning of the organization.  On one occasion, shortly after Cooper was hired, the members of the SLT had an impromptu meeting and O'Donnell happened upon it.  O'Donnell appeared upset and instructed the SLT to no longer meet without him.

**B.  Working relationship between Dykeman and O'Donnell**

On December 8, 2016, the Finance Committee of the GPYMCA board met at the GPYMCA headquarters.  Dykeman presented the annual budget to the committee, and CEO O'Donnell was scheduled to attend.  O'Donnell did not attend, for reasons O'Donnell and Dykeman dispute.  After the meeting concluded, Dykeman found that O'Donnell was in his office, and asked why he failed to attend the meeting downstairs.  Dykeman testified that O'Donnell lied to her and told her that he did not know about it. O'Donnell was polishing his shoes, and asked Dykeman for an article of clothing from her bag to use in shining his shoes. Dykeman had to leave to attend a holiday party at her social club.  O'Donnell told her to go have some drinks and relax.  In Dykeman's observation, O'Donnell did not miss meetings with the male members of the SLT, and she is not aware of O'Donnell asking anyone else for clothing with which to shine his shoes.

The following day, Dykeman entered CEO O'Donnell's office to provide some documents when Cooper was present.  O'Donnell brought up the prior evening's discussion and repeatedly

referenced Dykeman having drinks to cope.  Dykeman repeatedly
asked O'Donnell if they could discuss the issue at another time,
but O'Donnell continued to discuss it in front of the newly
hired Cooper.

CEO O'Donnell repeatedly asked Dykeman for budget documents
and posed questions to her, but did not allow Dykeman to explain
the GPYMCA budget and debt to him in person, as she thought
necessary.  Dykeman felt that O'Donnell similarly asked
repetitive questions without allowing her to provide full
explanations and face-to-face interactions on several other
financial issues.  According to Dykeman, COO Brown and Human
Resources VP Hannagan were permitted more frequent and
substantive meetings with O'Donnell.  The defendants contend
that all of the SLT members were subject to the same
restrictions, but at summary judgment the court must view all
facts in the light most favorable to the non-moving party.  The
record evidence does not foreclose Dykeman's interpretation.

On one occasion, CEO O'Donnell became belligerent towards
Dykeman, in front of Brown and Hannagan, for discussing GPYMCA
financials with Board Chair Corrigan.  Corrigan reports that in
meetings O'Donnell called Dykeman the "grim reaper" and referred
to her being inebriated.  When Corrigan raised the shoe-shining
incident with O'Donnell, he responded that Dykeman was too
tightly wound and just needed a few drinks.  O'Donnell also

called Corrigan to complain about Dykeman. At meetings, Corrigan observed that O'Donnell's body language expressed disinterest when Dykeman spoke. Board and executive committee member Adam Phillips observed that Dykeman appeared uncomfortable around O'Donnell, and Dykeman advised Corrigan that she felt uncomfortable sharing a car with O'Donnell.

On Saturday, January 7, 2017, CEO O'Donnell emailed Dykeman seeking information after Cooper had closed her computer for the day. He resent the email on Sunday. On Monday, he called Dykeman and complained that she was not providing him the required information. Dykeman responded that his requests did not involve her department, but O'Donnell stated that he did not care and expected Dykeman to provide the information and be more responsive. O'Donnell complained of the incident to Board Chair Corrigan, and suggested that he wanted to get rid of Dykeman.

### C. Working relationship between Cooper and O'Donnell

Cooper's role as Chief Marketing and Development Officer included functioning as the public face of the organization, in partnership with CEO O'Donnell. Shortly after hiring, O'Donnell required that all donor solicitations go through him. Cooper complained that she was being excluded and not allowed to do her job. Cooper testified that her male colleagues were allowed to remain involved in their areas of responsibility and provide

feedback to O'Donnell, while O'Donnell restricted her from attending meetings or acting without his explicit approval.

By Cooper's account, she was only allowed to attend two external meetings where CEO O'Donnell discussed fundraising. O'Donnell specifically invited her to the first meeting, with a proposed donor. During the meeting, O'Donnell stated that the population served by the GPYMCA doesn't look like O'Donnell or the donor, but instead looks like Cooper. Cooper interpreted this as a reference to her being a woman of color. Cooper only attended the second meeting because she was included on the email chain relevant to it, and Cooper learned from Azzoli, O'Donnell's assistant, that O'Donnell had inquired into why Cooper had been present. Otherwise, according to Cooper, O'Donnell did not invite her to donor meetings but would brag to her about the meetings he attended.

CEO O'Donnell and Cooper did not have planned meetings with agendas, and did not discuss fundraising style or strategy at impromptu meetings. Cooper reported to Human Resources VP Hannagan that she was frustrated with O'Donnell and felt that she was not being allowed to perform her job. In meetings with Corrigan and Phillips, O'Donnell referred to Cooper as a "know-it-all" and "busy body." The defendants argue that tensions between O'Donnell and Cooper arose from differences in fundraising strategy and personality conflict. But, at this

summary judgment stage, the court is obligated to view the facts and draw all reasonable inferences in favor of Cooper.

Cooper and CEO O'Donnell discussed hiring a short-term grant writer. She told him that she knew a good candidate who she had worked with prior, and interpreted O'Donnell's response as encouragement to proceed. Cooper and Dykeman interviewed the candidate and reviewed the proposed contract, and Cooper hired the grant writer. After a meeting on January 5th, 2017, where the grant writer was mentioned, O'Donnell called Cooper and, by her account, unleashed a tirade against her for hiring the grant writer without his explicit consent. Cooper testified that she was afraid of O'Donnell and apologized to him to stop him from yelling and screaming at her.

### D. Conflict between Corrigan and O'Donnell

Board Chair Corrigan testified that she informally received complaints about CEO O'Donnell from several female GPYMCA employees and that O'Donnell made comments in meetings regarding non-employees that she perceived as sexist. Corrigan described a conversation in early January 2017 with Cooper, Dykeman, executive assistant Azzoli, and GPYMCA employee Christine Spagnoli in which they discussed issues with O'Donnell. Corrigan did not receive similar complaints from Brown or Hannagan. After the conversation, Corrigan arranged a telephone

call with O'Donnell and Phillips.  On this call, the idea arose
of creating a chief of staff position as an intermediary between
O'Donnell and the staff, and someone proposed Corrigan for this
role.  O'Donnell and Corrigan dispute which of them initiated
both proposals, each claiming the other conceived of them.  At
summary judgment, the court must view the facts and draw all
reasonable inferences in favor of the plaintiffs.

On January 9, 2017, CEO O'Donnell presented the possibility
of Board Chair Corrigan as a chief of staff to the SLT.  The SLT
was not supportive.  Corrigan spoke to Dykeman the following
evening and represented that O'Donnell had convinced her to
become chief of staff over her reservations.  The next morning,
O'Donnell instructed Dykeman not to speak to the other members
of the SLT about her conversation with Corrigan, but Dykeman had
already told others.  O'Donnell was upset with Dykeman.  Dykeman
made a verbal complaint regarding O'Donnell to Hannagan.

On January 12, 2017, at 2:30 PM, Cooper texted CEO
O'Donnell to share what she believed to be good news regarding a
fundraising request she planned to submit.  O'Donnell replied
expressing concern that all requests for money should carry his
signature and saying that he would call Cooper.  Cooper
clarified that it was an online application.  O'Donnell left a
voice mail and Cooper said she would call O'Donnell back in a
bit.  Cooper became occupied with other business.  O'Donnell

sent his assistant, Azzoli, to ask Cooper to call O'Donnell. Cooper was further delayed and had an after-work commitment, so she left a voicemail for O'Donnell after 5:15 PM. In further text messages overnight, O'Donnell reprimanded Cooper for her response time and manner.

Cooper anticipated that CEO O'Donnell would summon her to a meeting the following morning and spoke with Hannagan, the VP of Human Resources. Hannagan offered to attend the meeting with Cooper, but Cooper declined because she feared it would escalate the situation. O'Donnell met with Cooper and the meeting devolved into shouting. Cooper then went to Hannagan to file a verbal complaint against O'Donnell.

VP Hannagan advised Cooper to contact Board Chair Corrigan because of Corrigan's position as Chief Volunteer Officer in accordance with the GPYMCA handbook. Cooper and Corrigan spoke by phone and Cooper made a verbal complaint regarding CEO O'Donnell's conduct. Cooper told Corrigan that she believed O'Donnell's actions were based on her gender, based on her observation of how he treated her male counterparts. Corrigan noted that she had heard similar complaints from Dykeman and advised Cooper not to do anything drastic, as Corrigan planned to speak to O'Donnell regarding the issue later that day.

Board Chair Corrigan raised Cooper's complaints with CEO O'Donnell. He told Corrigan not to speak with his subordinates,

as it undermined him.  In further discussions, he told Corrigan that she could not tell him who to take to donor meetings. Corrigan suggested that if O'Donnell was not able to resolve these issues, the upcoming six-month review of his position would be problematic.  She told him that she had the votes of the executive committee of the board.  O'Donnell responded that he had the votes of the full board, and could remove Corrigan.

CEO O'Donnell began seeking to remove Board Chair Corrigan from the board.  The board scheduled an emergency meeting to consider the matter.  Corrigan reached out to the YMCA of the USA, which advised her to obtain legal counsel.  Corrigan hired attorneys to provide the board with guidance on handling Cooper and Dykeman's claims.

Board member Phillips testified that another member of the executive committee strongly suggested that Cooper and Dykeman's claims could be resolved by removing Board Chair Corrigan.  CEO O'Donnell asked the executive committee to place Cooper and Dykeman on administrative leave pending an investigation of their claims, but the committee declined to do so.

On January 19, 2017, Cooper and Dykeman filed written complaints against CEO O'Donnell with Human Resources VP Hannagan.  The day prior, Dykeman sought treatment with her physician for anxiety.  After receiving the complaints, the board provided that, for the duration of an investigation,

Cooper and Dykeman would report through Hannagan, and any communication by O'Donnell to them should go through Hannagan. O'Donnell did not want to attend any meetings with Cooper and Dykeman after they filed their complaints, and they were excluded from an SLT meeting. Cooper was not invited to a fundraising meeting with a contact who she had known for many years. Cooper also testified that after the complaint was submitted, she began receiving unreasonably demanding requests from the GPYMCA's treasurer.

On January 23, 2017, the GPYMCA board removed Corrigan from her position as chair and from the board. Phillips and others resigned from the executive committee, and its membership was almost entirely turned over. Jamia McDonald eventually became the new chair.

### E. Investigation of Cooper and Dykeman's complaints

The GPYMCA retained Marjorie Lewis Dwyer to investigate Cooper and Dykeman's claims. Dwyer interviewed Cooper, Dykeman, COO Brown, and Human Resources VP Hannagan. Cooper and Dykeman requested that Dwyer interview Corrigan. Hannagan told Dwyer that he believed CEO O'Donnell treated Cooper and Dykeman differently from how he treated Brown and Hannagan, even though the same rules applied to all of them. The defendants argue that Hannagan's deposition testimony disclaims this view, but

Dwyer's report is part of the record, and at the court must view the facts in the light most favorable to the plaintiffs. After Dwyer interviewed Brown, O'Donnell had a conversation with Brown in which O'Donnell attempted to convince Brown that he was not guilty of the allegations.

On January 26, 2017, CEO O'Donnell issued a directive to the SLT. He included and added to the SLT two female employees who had never previously been members of the SLT. The directive instructed the SLT members to report any contact with the board to O'Donnell, have no business-related communications with Corrigan, and refer any contact initiated by her to O'Donnell. It also suspended the ability of the SLT members to sign contracts or undertake other administrative functions without O'Donnell's review. And it required that the SLT members make their daily schedules available to O'Donnell.

According to Dykeman, the removal of her contract and spending authority undermined her ability to do her job, appropriately respond to internal and external parties, or appear competent to others. She testified that CEO O'Donnell's responses to her requests for review were delayed. Similarly, Cooper testified that the directive left her isolated and without administrative authority.

Dwyer continued her investigation. She reinterviewed COO Brown and interviewed CEO O'Donnell and his executive assistant

Azzoli. She was setting up an interview with former Board Chair Corrigan. But the GPYMCA instructed her to stop conducting interviews. Dwyer testified that she believed this was before she had provided any rough findings to the GPYMCA. Dwyer let Corrigan know that Corrigan would not be interviewed. Corrigan informed Cooper and Dykeman, and made them aware of O'Donnell's prior email to the executive committee in which he sought to have Cooper and Dykeman placed on administrative leave. Dwyer did review this email in her investigation. Dwyer provided an oral briefing to the GPYMCA of her results.

On February 8, 2017, counsel for Cooper and Dykeman wrote a letter to Board Chair McDonald alleging that both CEO O'Donnell and the board had retaliated against Cooper and Dykeman, and objecting to the closure of Dwyer's investigation without interviewing Corrigan. The plaintiffs asked to be placed on paid administrative leave until a "truly independent" investigation was completed, and indicated that they would not return to work until the matters were resolved.

The next day, investigator Dwyer provided her written report to the GPYMCA. Dwyer found that Cooper and Dykeman had brought their complaints in good faith. But she found that there was not enough evidence for her to conclude that CEO O'Donnell had treated them differently because of their gender. Although there was some evidence that he had treated them

differently, these differences could be attributed to other factors, including personality conflicts, their communications with Corrigan, and disagreements regarding business tactics. She also found that O'Donnell's conduct did run afoul of the organization's general anti-harassment policies, although there was not sufficient evidence that it violated the EEO statement in the GPYMCA's employee handbook.

Board Chair McDonald then sent an email to the board which contained investigator Dwyer's report, the letter from plaintiffs' counsel, a board update document, and recommendations prepared by CEO O'Donnell. The board update document characterized the plaintiffs' complaints as having no merit, a phrase Dwyer did not use in her report. It stated that after receiving Dwyer's oral briefing, the executive committee had asked O'Donnell to make recommendations for going forward. The recommendations provided that Cooper and Dykeman should either be allowed to resign or be dismissed for cause, citing "failed performance, as well as insubordination, among other issues." O'Donnell also recommended that Human Resources VP Hannagan and COO Brown be placed on administrative leave pending investigations. Board member Phillips informed former Board Chair Corrigan of the contents of this email, and Corrigan informed Cooper.

**F.  Cooper and Dykeman leave the GPYMCA**

On the same day that Board Chair McDonald emailed the board, Cooper and Dykeman began working from home and only came into the GPYMCA offices for meetings.  McDonald sent plaintiffs' counsel a letter that day representing that no final decision had yet been reached on the merits of their complaints and indicating that Cooper and Dykeman were expected to be at work.  McDonald stated that, if they did not report to work, they would be considered to have resigned their positions.  Counsel responded with a letter reiterating the plaintiffs' position and intent to work from home.

A few days later, Board Chair McDonald sent a letter to Cooper and Dykeman informing them of investigator Dywer's report and characterizing its conclusions.  On that day, before receiving the letter, Cooper attended a meeting at the GPYMCA offices.  Cooper testified that in that meeting CEO O'Donnell made unreasonable requests, asked her to unethically solicit from her prior employer, and accused her of defying him.  Over the next couple of days, O'Donnell sent emails to Cooper and Dykeman with conciliatory language, but also demanding that they return to working from the office immediately.  He indicated that if they did not return, they would be presumed to have abandoned their jobs.

Plaintiffs' counsel replied to Board Chair McDonald's letter and disputed her characterization of investigator Dwyer's findings. He asserted that Cooper and Dykeman had been constructively discharged from their positions, and asked the GPYMCA to cease any direct communications with them.

Tempie Thompson assumed Cooper's duties. CEO O'Donnell remains the CEO of the GPYMCA, but all the other members of the SLT from January 2017 (Dykeman, Cooper, COO Brown, and Human Resources VP Hannagan) no longer work for the GPYMCA. The current SLT consists of seven employees, five of whom are female. The defendants claim that O'Donnell's subsequent promotion of female employees undermines the plaintiffs' allegations of discriminatory animus. But the import of O'Donnell's conduct after being accused of discrimination is subject to multiple interpretations, and the court, at summary judgment, must draw all reasonable inferences in the plaintiffs' favor.

The plaintiffs bring 18 claims against the GPYMCA and CEO O'Donnell, under Rhode Island's Fair Employment Practices Act ("FEPA") and Civil Rights Act ("RICRA"), Title VII of the federal Civil Rights Act of 1964, and the common law. Cooper and Dykeman each bring claims against the GPYMCA for both discrimination and retaliation under FEPA, RICRA, and Title VII.

Against CEO O'Donnell, each brings claims for discrimination and retaliation under RICRA, and for defamation.

## III. **Analysis**

The defendants seek summary judgment on all of Cooper and Dykeman's claims.  As a preliminary matter, they argue that, as to Cooper only, they are entitled to a "same actor" inference because CEO O'Donnell both hired and allegedly took adverse action against Cooper.  The defendants then argue that:

- both plaintiffs cannot prevail on their discrimination claims because the plaintiffs have failed to produce evidence that O'Donnell's treatment of Cooper and Dykeman was related to their gender and because the alleged harassment is insufficiently severe or pervasive;

- neither Cooper or Dykeman suffered an adverse work action, and so cannot prevail on retaliation claims;

- each plaintiff was not constructively discharged; and

- the plaintiffs' defamation claims are contradicted by the record.

The plaintiffs oppose summary judgment on the discrimination and retaliation claims, but no longer press their claims for defamation.  The court, as explained below, agrees with the plaintiffs that genuine issues of material fact remain

regarding the discrimination and retaliation claims.  The
defendants' motion for summary judgment is thus denied as to
those claims and granted as to the defamation claims.

The court assumes, as the parties do in their papers, that
both the state and federal discrimination and retaliation claims
may be analyzed together under the federal standard.  See Ferro
v. Rhode Island Dep't of Transp. ex rel. Lewis, 2 F. Supp. 3d
150, 157 (D.R.I. 2014) (Smith, J.) ("[T]he Rhode Island Supreme
Court routinely analyzes FEPA claims under Title VII and . . .
FEPA and RICRA claims rise and fall together.")

### A.    Same actor inference

The defendants argue, with respect to Cooper only, that
they are entitled to the same actor inference.  "In cases where
the hirer and firer are the same individual and the termination
of employment occurs within a relatively short time span
following the hiring, a strong inference exists that
discrimination was not a determining factor for the adverse
action taken by the employer." LeBlanc v. Great Am. Ins. Co., 6
F.3d 836, 847 (1st Cir. 1993) (quoting Proud v. Stone, 945 F.2d
796, 797 (4th Cir. 1991)).  CEO O'Donnell, the defendants
contend, hired Cooper relatively shortly before any alleged
adverse action, so a strong inference should exist that
discrimination was not a determining factor in any adverse

action.  In response, Cooper argues that the same actor inference is at odds with psychological science, does not apply to the facts of this case, and, even if it might apply, is an issue for trial.

The court agrees that the logic of the same actor inference does not apply to the facts of this case, and it need not consider Cooper's other arguments.  The inference rises from the intuition that "[f]rom the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."  Proud, 945 F.2d at 797 (quotations omitted).  The facts of this case vary from that premise in at least two ways.

First, the inference assumes that the putative discriminator exercises sufficient control over the hiring process to exclude individuals they are prejudiced against. Here, Cooper appears to have been the first senior employee hired after CEO O'Donnell joined the GPYMCA, and she was also interviewed by the other members of the SLT and Board Chair Corrigan.  While O'Donnell ultimately controlled the decision to hire Cooper, his ability to inject any discriminatory prejudices into the hiring process was limited by potential scrutiny from other actors, and he reasonably may have been especially sensitive to such scrutiny so early in his tenure.  It is thus

unclear that he would have had been able to exclude candidates based on any discriminatory prejudice.

Second, the inference assumes that the putative discriminator seeks to terminate an employee primarily because of a status or condition the discriminator would have been fully aware of when hiring the employee.  This is perhaps most intuitive in the age discrimination context, as seen in both Proud and LeBlanc.  Proud, 945 F.2d at 797 ("the individual who fired Proud is the same individual who hired him less than six months earlier with full knowledge of his age"); LeBlanc, 6 F.3d at 847 (unlikely that supervisor who hired plaintiff "would develop an aversion to older people less than two years later").  The same logic can apply to other forms of discrimination, including gender-based discrimination, but must follow the same pattern.  So, for instance, a plaintiff's "allegation that her supervisor wanted a male in the position is at best suspicious" when the supervisor "is the same person who originally made the decision to hire her less than a year earlier."  Bradley v. Harcourt, Brace, & Co., 104 F.3d 267, 270 (9th Cir. 1996).

But employment discrimination law protects against more than discriminators whose "dislike" of a protected class manifests as seeking to avoid "associating with them."  See Proud, 945 F.2d at 797.  It is not difficult to imagine a supervisor who is willing to hire members of a protected class,

but then expects those individuals to tolerate unlawfully discriminatory treatment at the workplace.  Cooper's claim here is closer to this scenario than that assumed in the same actor inference.  She does not allege that CEO O'Donnell sought to replace her with a man, but that he expected to be able to treat female executives "differently, more harshly, and with less respect than the male executives."[1]  There is a logical tension if a supervisor hired a woman, but is accused of quickly firing that woman in order to replace her with a man.  If the supervisor wanted a man, why initially hire a woman?  That tension does not exist where, as here, the supervisor is instead accused of expecting female employees to accept disparate treatment on the job.  The same actor inference does not apply to Cooper's claims.

### B.   Hostile work environment

To prevail on their claims premised on a hostile work environment, each plaintiff must establish:

> (1) that plaintiff is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and that she in fact did perceive it to

---

[1] Am. Compl. (doc. no. 14) ¶ 16.

be so; and (6) that some basis for employer liability has been established. [Franchine v. City of Providence, 881 F.3d 32, 46 (1st Cir. 2018)](). The defendants argue that Cooper and Dykeman have not offered evidence showing the third and fourth requirements: sex as a basis for the harassment, and severity and pervasiveness of the harassment.

### 1. Harassment based on gender

The defendants contend that the plaintiffs have not produced evidence showing that CEO O'Donnell's allegedly hostile treatment of them was based on their gender. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of" a protected characteristic. [Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)](). But "[d]iscriminatory conduct unlawfully based on one's membership in a protected class need not be overt to be actionable." [Flood v. Bank of America Corp., 780 F.3d 1, 11 (1st Cir. 2015)](). A plaintiff must do more though than allege that her supervisors "did not engage in the same type of screaming and yelling at male employees," as that does not provide the necessary connection to gender if there are "a plethora of other reasons [her] superiors might have" yelled at her and not the male employees "that have no nexus to her

gender." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 94 (1st Cir. 2018).

The defendants first argue that none of the alleged incidents involve an express reference to gender or the use of derogatory terms associated with women. Even if this is accurate, the lack of overt reference to gender is not dispositive. See id. They also describe several areas of evidence that they argue show that CEO O'Donnell did not discriminate based on gender:

- O'Donnell placed the same work restrictions on all the members of the SLT, male and female;
- the male members of the SLT had similar concerns regarding O'Donnell's management style;
- the investigator, Dwyer, found alternative reasons, unrelated to gender, for any heightened conflict between O'Donnell and the plaintiffs; and
- O'Donnell's positive treatment of other female employees demonstrates that his conflicts with the plaintiffs were not based on gender.

These are potentially sound, even persuasive, arguments to make at trial. But, viewing all facts and drawing all reasonable inferences in the light most favorable to the plaintiffs, they do not foreclose a reasonable factfinder from finding discrimination based on gender.

The plaintiffs have presented evidence that would allow a reasonable finding of gender-based discrimination. They do not rely solely on their own allegations that CEO O'Donnell treated them more harshly than their male peers. See Rivera-Rivera, 898

F.3d at 94.  There is also evidence from former Board Chair
Corrigan to that effect, and investigator Dwyer's report
reflects that Hannagan made similar statements to her.  See
supra Parts II.D and II.E.  While Dwyer concluded that there was
not enough evidence for her to find that O'Donnell's conduct was
based on gender, the factfinder here is not bound by her
conclusion, especially since Dwyer did not have access to
Corrigan's account and other evidence.

Other evidence could also reasonably implicate gender.  The
shoe-shining incident with Dykeman arguably suggests gender-
based assumptions and prejudices.  Former Board Chair Corrigan
and others testified that O'Donnell used terms for the
plaintiffs and other women that were not explicitly sexist, but
in context arguably reflected gender-bias.  See supra Parts
II.B, II.C, and II.D.  In DeCamp v. Dollar Tree Stores, Inc.,
the Rhode Island Supreme Court considered whether summary
judgement should be granted where none of the incidents between
the plaintiff and her supervisor included an express reference
to gender, but some evidence indicated the supervisor had
separately "been accused of treating women differently and
especially poorly."  875 A.2d 13, 23 (R.I. 2005).  "Although
this evidence of gender-based treatment may be less than
compelling," the court found, "the evidence . . . , when viewed
in the light most favorable to plaintiff, creates a genuine

issue of material fact about whether [the supervisor's]
mistreatment of plaintiff was based on her gender for purposes
of summary judgment." Id. The evidence of gender-based
treatment here may similarly be "less than compelling," but this
weakness does not negate the genuine issues of material fact
present on this record.

### 2. Severity or pervasiveness

To meet the fourth requirement of a hostile work
environment claim at this summary judgement stage, the
plaintiffs "must provide sufficient evidence from which a
reasonable factfinder could determine that the workplace was
permeated with discriminatory intimidation, ridicule, and insult
that was sufficiently severe or pervasive to alter the
conditions of . . . [their] employment and create an abusive
working environment." Rivera-Rivera v. Medina & Medina, Inc.,
898 F.3d 77, 91 (1st Cir. 2018) (quotations omitted). "This is
not, and by its nature cannot be, a mathematically precise
test," but instead "can be determined only by looking at all the
circumstances." Id. The relevant circumstances include "the
frequency of the discriminatory conduct; its severity; whether
it was physically threatening or humiliating, or a mere
offensive utterance; and whether it unreasonably interfered with
an employee's work performance." Id. This inquiry aims to

"distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." Id.

But, "[s]ubject to some policing at the outer bounds, it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." Id. "Pervasiveness and severity are questions of fact." Flood, 780 F.3d at 11. And although "the harassment must pass a certain threshold of severity," a hostile work environment can be shown through harassment that is "more pervasive than severe." Flood, 780 F.3d at 6; Rivera-Rivera, 898 F.3d at 93 ("[F]requent incidents of harassment, though not severe, can reach the level of 'pervasive'").

The defendants contend that the record only shows that CEO O'Donnell was a demanding manager who engaged in close oversight of the SLT, including Cooper and Dykeman. It is true that "a supervisor's unprofessional managerial approach and accompany efforts to assert her authority are not the focus of the discrimination laws." Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 44 (1st Cir. 2011). But, viewing the facts in the light most favorable to the plaintiffs, a reasonable factfinder could determine that Cooper and Dykeman were subject to more than merely distressing management techniques, but to severe or pervasive "intimidation, ridicule, and insult . . .

create[ing] an abusive working environment." See Rivera-Rivera, 898 F.3d at 91. The plaintiffs have presented evidence that O'Donnell, not only their supervisor but the leader of their organization, regularly humiliated them, deprived them of any discretion to perform their roles, and focused his ire on them because of their gender. See supra Parts II.B, II.C, II.D, and II.E. This evidence "includes atmospheric and job performance-related incidents, both of which may support" a hostile work environment claim, even if not actionable on their own. See id.; Flood, 780 F.3d at 12. There is also evidence, as the defendants recount, that calls these claims about O'Donnell's behavior into question and suggests more conventional workplace tensions. But "it is for the jury to weigh those factors" at trial, see Rivera-Rivera, 898 F.3d at 91, and removing this case from the jury's consideration would impermissibly surpass the "policing at the outer bounds" authorized by our Court of Appeals. See id.; Flood, 780 F.3d at 11. The evidence of severity and pervasiveness can be reasonably interpreted in very different ways, but thus presents genuine issues of material fact.

To be sure, the hostile work environment claims (motive and severity or pervasiveness) present a close call on the summary judgment record, and the claims may very well be vulnerable to

Rule 50 dismissal at trial based on live testimony.  But in this procedural posture, the claims must proceed.

### C.  Retaliation

To succeed on their retaliation claims, the plaintiffs must each demonstrate that:  "(1) she engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) that the adverse employment action is causally linked to the protected conduct."  Rivera-Rivera, 898 F.3d at 94.  Adverse employment actions include "all employer actions that would have been materially adverse to a reasonable employee, defined as actions that are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Id. at 95.

The defendants argue that Cooper and Dykeman have failed to show that they suffered any adverse action because they have not shown that there was any increase in discrimination or harassment after they brought complaints, as opposed to continuation of the preexisting behavior.  See Air Sunshine, Inc. v. Carl, 663 F.3d 27, 37 (1st Cir. 2011) (alleged retaliation cannot be mere continuation of conduct that gave rise to complaints or conditions that long predated the protected action); Hall v. Parker Hannifan Corp., 824 F. Supp. 2d 464, 469-70 (W.D.N.Y. 2009) ("some increase in the

discrimination or harassment – either a 'ratcheting up' of the preexisting behavior or new, additional forms of harassment" necessary for retaliation).  Cf. Rivera-Rivera, 898 F.3d at 96 (summary judgment on retaliation inappropriate because "there is a glaring distinction between the bouts of alleged harassment Rivera claims she endured before the charges were filed and the harassment she alleged afterwards").  A reasonable factfinder might well agree with the defendant's view of the evidence.  But a reasonable factfinder might also find that the plaintiffs have shown that CEO O'Donnell's treatment of the plaintiffs intensified and worsened after he became aware of their oral or written complaints, See supra Parts II.D, II.E, and II.F, or that the actions taken by O'Donnell and the GPYMCA board concerning the investigation of those complaints harmed the plaintiffs and would "dissuade a reasonable worker from making" similar complaints.  See supra Parts II.D, II.E, and II.F; Rivera-Rivera, 898 F.3d at 95.  There are thus genuine issues of material fact regarding retaliation, even though the alleged retaliation may be more nebulous than in paradigmatic cases.

    D.    **Constructive discharge**

    To prevail on a theory of constructive discharge, each plaintiff must show that:  "(1) a reasonable person in her position would have felt compelled to resign; and (2) she

actually resigned." Vélez-Ramírez v. Puerto Rico, 827 F.3d 154, 158 (1st Cir. 2016).  The first element is met if "a plaintiff's working conditions were so onerous, abusive, or unpleasant that a reasonable person in her position would have felt compelled to resign," but requires more than "the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Rivera-Rivera, 898 F.3d at 96.  This is a "graver" standard than that for a hostile work environment, because it requires behavior that not only alters the conditions of the plaintiff's employment, but is so intolerable as to compel resignation.  See Pa. State Police v. Suders, 542 U.S. 129, 146-49 (2004).

The defendants contend that the plaintiffs cannot show that a reasonable person in Cooper or Dykeman's shoes would have felt compelled to resign.  But, taking the facts in the light most favorable to the plaintiffs, a reasonable factfinder could find that, despite CEO O'Donnell's formal words of reconciliation, his practices and the GPYMCA board's handling of the investigation left Cooper and Dykeman so professionally powerless and exposed to discrimination and retaliation that their positions were "intolerable."  Id.  Given evidence indicating that O'Donnell advocated for the defendants to be put on administrative leave prior to any investigation and later recommended that they be fired for cause if they did not resign, a reasonable factfinder might even find that the plaintiffs were

subjected to "a calculated effort to pressure [them] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by [their] co-workers," a core concern of constructive discharge.  Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994); see supra Parts II.D and II.E.  Of course, a reasonable factfinder, after weighing the evidence and assessing credibility, might instead conclude that the plaintiffs were not reasonably compelled to resign and that the defendants' actions were reasonable.  But this is thus a genuine dispute of material fact and summary judgment is inappropriate.

## IV.  <u>Conclusion</u>

The summary judgment record can be reasonably interpreted in multiple ways.  It may reflect only personality conflicts between a demanding boss attempting to reorient a troubled organization and employees with different work styles.  Or it may suggest that these disputes were driven, at least in part, by board-level machinations.  But viewing the facts and drawing all reasonable inferences in the plaintiffs' favor, as Rule 56 requires, the summary judgment record can be read to show gender-based discrimination and retaliation.

Genuine disputes of material fact remain as to the plaintiffs' discrimination and retaliation claims.  The plaintiffs no longer press their defamation claims against

O'Donnell.  Defendants' motions for summary judgement against

Cooper and Dykeman[2] are thus granted as to the defamation claims

against O'Donnell but otherwise denied.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge


Dated:  November 8, 2019

cc:  David S. Cass, Esq.
     John D. Doran, Jr., Esq.
     Jillian S. Folger-Hartwell, Esq.
     Alexsa Marino, Esq.

---

[2] Document nos. 53 and 55.